May it please the court. My name is Lewis Lang. I represent Sean Ath, who is the appellant in this matter. And the issue before the court is the sufficiency of the government's evidence to sustain the convictions of my client at trial. My client was convicted on three counts of a five count indictment. First count was a conspiracy to possess with intent to distribute more than 50 grams of methamphetamine and a quantity of marijuana. The second count was the use of a mail facility in furtherance of a drug transaction or drug crime. The third count was possession with intent to distribute a quantity 50 grams or more of methamphetamine. Those last two substantive counts had attached to them in the indictment count itself an aiding and abetting count on each of the two substantive counts. We suggest to the court that all of the counts, substantive counts and the conspiracy counts, have an element of knowledge. And we suggest to the court that the government's evidence fails, even though it's a very heavy burden, as this court has said repeatedly, most recently last Friday in United States v. Paul, for an appellant to carry. But we suggest to the court that based on the evidence deduced at trial, there's insufficient evidence that a rational jury could conclude that the government had established the element of knowledge on the three counts, conspiracy and the two substantive counts, beyond reasonable doubt. The aiding and abetting count has a slightly different number of elements to it, but I would suggest to the court that that also has an element of knowledge, knowledge of the fact that a crime had been committed, knowledge of joining in the crime and actually promoting its conclusion. And that also has an element of knowledge in those two aiding and abetting counts. I would like to go through now the evidence that the government deduced at trial, and I would divide that evidence into the direct evidence of the government asserts of my client's guilt and then the circumstantial evidence of my client's guilt that the government presented at trial. The only direct evidence of my client's guilt is the 7 September 2016 controlled delivery of a package, a sealed package, which contained approximately 497 grams of methamphetamine, which had been intercepted by a postal inspector on the 2nd of September. We have a video of that. That's in Volume 3 of the Joint Appendix. And just very briefly, Your Honor, is going through that video. All it shows is the postal inspector driving up in his postal truck, getting out of the truck. It's parked right to left, so you don't see him getting out because it's a right-hand drive. He goes up to my client's house, knocks on the door. No one answers, so he returns to the truck. Shortly thereafter, my client enters stage right. He goes behind the truck, so you don't actually see the carrier delivering or handing the package to my client, although the postal inspector testified that's what he did. My client took the sealed package, took it up to his porch, put it down on the porch, filled it with his keys in his pockets, unlocked the door to his house, picked up the package, and took it into the house. That's it in terms of direct evidence of my client's possession of that sealed package. They did have possession then, right? Returns to his house, goes into the house, goes back outside the house, and then Mr. Chen leaves the house, gets into his car, carrying the package itself, and drives away. Shortly thereafter, Mr. Chen is arrested by law enforcement who had been surveilling this entire circumstance. So that's the only direct evidence in this record to indicate that my client had anything to do with this conspiracy. What about the driver's license numbers? Well, the driver's license numbers are interesting, and that goes to my second point, Your Honor, about the circumstantial evidence. As part of the government's case, they asserted that my client's driver's license had been utilized on the 6th of September, the day before the control package was delivered, by way of using that driver's license to make a $3,200 deposit in the Bank of America branch in Spartanburg, South Carolina. It was into an account that was linked with the package sent from California, right? Yes, sir. And all the packages originated from California. So that's an account connected, and the identification number was used, so that bank account was clearly linked to California. There's no question of that. Bank account was clearly linked to the California, Billy Femmes Bay. California was sending out the packages regularly and giving addresses to which to send it, and 199 Black Street was one of the addresses. That's correct, and there were actually two previous packages. 199 Black Street belonged to your client. He rented that space, Your Honor. That's correct. It was on his driver's license, on his driving record. Actually, there were two previous packages that had been sent, two and four years previous to that. They both contained marijuana, intercepted, never delivered. But in terms of the driver's license itself, I would suggest that that doesn't show anything, and the reason for that is... Well, the next day he has a driver's license with the same number and stuff. Well, the first thing you have to do, Your Honor, is infer from... Well, we do not have whatever it was that was presented to that teller on the 6th of September. That's not in evidence at all. But we know the driver's license number because that was recorded. We do know the driver's license number, but we also know... It was recorded in connection with a deposit to the payment for the methamphetamine that was sent. That's correct, and that deposit was made... It was sent then to your client's house. That deposit was made, however, by... Your client then received it, looked at it. It was addressed to Rydell, not him. That's correct. He looked at it, but at his address, and he took it into the house. He did. And then he ended up leaving the house, not locking it. Chen comes in while he's gone, comes out, and then Chen eventually comes out with the package. Those are facts, Your Honor. And then when they pick up your client, he tells two or three different stories about what happened. Well, I'd like to address, get back to the license. I'll address the... I'm just adding some other evidence that you left out. I haven't even gotten there yet, Judge, but I will. I'm not going to leave that out. The driver's license, we don't have an evidence. What we have are two things. We have what the teller recorded as to that driver's license, and we have the surveillance picture of the person who actually made that deposit, who was not my client. The testimony that was clear from the testimony that was adduced at trial, that the person who made that deposit was an African-American female, not my client. So in addition to that, Your Honor, there was a mistake, an error. The expiration date on my client's driver's license is not the same as the expiration date recorded by the teller. So in order to get to that circumstantial evidence, I would suggest to the court that the jury would have to infer that it was actually my client's driver's license that was utilized to make that deposit. And I would suggest to the court that that is... They would just have to know that that account was an account from the California operation. It's clear you've agreed with that. That account was connected to the California operation. And somehow this woman who deposited the money the day before had his number. So it was made available somehow to him. And then his address was used as a house. So you think that was just made up by somebody, too? That was an accident. They sent the methamphetamine to his house. I would suggest, Your Honor... And then there was this mistake, and he took the package and read it. And you actually see him there looking at it. And he didn't hand it back. This is not my package. He took it into the house, and then he delivered it to Chang. Your Honor is making inferences upon inferences with all due respect. And the inference that has to be made... Well, you do look at the circumstantial evidence, but you also have to look at whether or not the inferences, in the light most favorable to the government, are rational or reasonable inferences. And I would suggest to the Court that an African-American woman, somehow using some document which had my client's license number on it, but could not have had his picture on it because we know in South Carolina... Yes, but she was depositing... It doesn't matter. She was depositing $3,000, more than $3,000, into an account, which was part of a conspiratorial account. That's correct, Your Honor. No question about that. And conclusively part of the methamphetamine operations account. But the... So she is doing that, and the question is, okay, she's using his number. We don't know how he got it. It's just a coincidence. But the next day, his number's on the license, the very same number. So set that aside. But that is evidence. There is a link there. In other words, you just add up all these links. Do you think a person on the street, the jury didn't think he was innocent? The jury put it all together and says he's right in the thick of it. Well, of course a jury did that. But this Court, even though it's a de novo review of a denial of a Rule 29 motion, the Court still has to look at the evidence and determine if a rational jury could make that determination. I suggest as far as the driver's license goes, it couldn't. Because you have to infer that it was actually my client's driver's license. You wouldn't have to know that. It's just one of the coincidences. It happened to be that account was, he didn't know, he's not linked to that account, except to the fact that that account's linked to the conspiracy in California, to the meth package. The meth package is sent to his house, and he picks it up, hands it, looks at it, and accepts it and receives it. So that's the linkage. Now, the question is, the fact that they used his driver's license number to make the deposit, it seems to me it's a mighty big coincidence, isn't it, if she just stole it and found it or something, and she's making the deposit? If there's no connection, and there's no evidentiary connection between my client and whoever used whatever it was to make that deposit, then I suggest the inference that somehow, and the only way that's at all relevant to the case, the government's case, is that somehow my driver's license number was utilized with my consent or at least knowledge. And there's absolutely no evidence of it. Then his address was used for this knowledge and consent, and that he received the package. In other words, okay, I hear what you're saying. And going back to that, Your Honor, the use of my client's address, 199 Black Street, there's no evidence to indicate my client had anything to do with that at all. Why is he telling different stories to the police when he's not? Well, in terms of the false exculpatory statement, which I would preface my remarks. One or two different things. Well, but I would focus the Court's attention on what a false exculpatory, the plain language of false exculpatory statement is. It has to be exculpatory. I didn't do it. I wasn't there in Raspberry. Why does it have to be false and exculpatory? That may be a doctrine, but the fact is when he told the story, he told a lie, and the officers knew it was a lie, which is inculpatory. In other words, what's he covering up? Your Honor, I respectfully disagree. And I respectfully disagree because the doctrine of false exculpatory statement says, number one, a false exculpatory statement is not inference of knowledge. It can be used as an inference of consciousness of guilt. Number two, it has to be exculpatory. And in this circumstance, my client didn't ever say he didn't get it, he didn't take the package, he didn't take it onto his porch and put it on his porch. He never said he didn't take it in. What he did say. Forget the substance of the statement. I don't think the officers intended to use the substance of the statements. What they intended to use is the fact that he lied. In other words, regardless of what he said, what happened, they asked him questions basically about things they saw and so forth, and he lies. They say there is something wrong when somebody's doing that. They're covering up something. That's another little piece. They didn't rely on the substance of it. They didn't care whether the package was set there, outside on the porch, or set in the house. The fact is he was a few minutes before went through some conduct, and he lied about what he did. Your Honor, I would suggest he didn't lie. You know, I would suggest that. Well, he didn't tell the correct story. Correct. And, again, when you talk about false exculpatory statements, it's a very powerful but very dangerous doctrine because, as the Raspberrian Court said, in the Tenth Circuit and the Second Circuit in Newsradi, cases which I cite, an equally reasonable sort of circumstance is when you're confronted by law enforcement and all of a sudden you understand that you're somehow implicated, then you try to get yourself out of it. Even if you knew nothing about what was going on, and it's exactly what occurred in this circumstance, I would submit to the court. The last thing I see my time is about up is the doctrine of willful blindness. That instruction was given. There is no objection to that instruction. But I would suggest to the court that willful blindness is not sufficient to save the government's case in this circumstance. There's no evidence to indicate there are two elements of willful blindness. It has to be facts that would indicate a high probability of a fact, and then, two, that somehow my client was ignoring or being willfully blind to that fact. And, again, my client's on the scene only for about 20 minutes during that controlled delivery, and that's all the direct evidence there is. There is none. Excuse me. You didn't object to that instruction? No, sir. It was not objected to in the court below. What do we have to do with that? This is on sufficiency of evidence. You also thought that it was relevant to the jury's determination of facts to be instructive in every regard because you didn't object to it, correct? Well, the trial defense counsel did not object to it. That's what I mean, right? Yes. Why are you arguing that here for us? Well, the government brought it up as to bolster its very weak case, I would suggest, to the court, and I would suggest to the court that... Willful blindness won't take place in evidence if it's insufficient. You're correct about that, but in the context you're arguing, I don't see how relevant that is when you didn't object to it. Well, its only relevance, Your Honor, is I don't think the elements of willful blindness were made out based upon the facts that were introduced at trial. All right. Thank you, Your Honor. Ms. Washington. May it please the court, Lisa Washington for the United States. Your Honors, this court should affirm the convictions at the district court because the government presented sufficient evidence as to the defendant's knowledge that he was involving himself in a drug conspiracy as well as the substantive offenses. The government proved knowledge on the defendant's part, both actual knowledge and by willful blindness. Well, which one are you relying on here? The government's relying on both, Your Honor, and the government relied on both at trial. The issue of willful blindness was heavily cross-examined. The jury... For willful blindness, what are you pointing to as sort of the affirmative act that was taken to avoid learning the truth? Your Honor, it's important to examine how the defendants, in this case, went about committing the offenses. On February 2nd... I'm sorry. Just because your time is limited, could you just say what's the affirmative act? Yes, ma'am. I'm sorry. On September 7th, Mr. Ath was present at his residence to accept the package from Postal Inspector Nicholson. He came from the direction of 210 Black Street, was Inspector Nicholson's testimony. Once Mr. Ath arrived at 199, his residence since 2005, Mr. Ath took the package without looking at it, without commenting on the face... He looked at it. He looked at it and without commenting that the address, the return address, the sender name as well as the recipient name was not his own. This all seems to go to actual knowledge, but what's the... Your Honor, he did not comment. The testimony from Inspector Nicholson was that the defendant did not ask any questions. I was not commenting a sign that he is purposely trying to not find out what's in the package. Your Honor, it's reasonable for any person or jury to logically conclude that if they received a package in the mail that was not addressed to him or her, or anybody at the residence stated on the package, it would be reasonable to expect the recipient... Wait, wait, wait. I totally understand that argument. I'm sorry. I thought that argument went to actual knowledge. He obviously knew exactly what was going on, and that's why he didn't say anything that had the wrong name on it. Excuse me. It goes to both. How does it... The defendant was willfully blind to the fact that he was accepting a package that was not addressed to him nor anyone at his residence. But accepting a package not addressed to you is not a crime. I don't... There was no curiosity about why a package that was misaddressed was being delivered to him at 199 Black Street. In addition, Your Honor, Mr. Chang's immediate arrival at 199 Black Street after the package was accepted, his going into the house for approximately 4 minutes, Mr. Ass entering the house shortly after Mr. Chang arrived back at 199, Mr. Ass' presence in the house for at least 2 1⁄2 minutes while Mr. Chang was in the house with the package, and Mr. Ass remaining at the residence, entering and exiting the residence multiple times while Mr. Chang was in the house with the package. When Mr. Chang leaves the house with the package, Mr. Ass is sitting on the front porch. Mr. Ass had ample opportunity given his presence at the residence along with Mr. Chang to inquire about the contents of the package. Can I just tell you my concern? So we've said a number of times that willful blindness is not recklessness. It's not that you had a chance to find out what was going on and you should have taken it, but you didn't. It's not you should have known. It's that you affirmatively took some action to sort of turn away from what was happening in front of you. So we have cases, for instance, where someone's driving a truck full of drugs and then they leave the garage when the truck gets unloaded, and we say, okay, that was the affirmative act you took to avoid finding out what was inside the truck. And so I'm just looking for... I mean, I'm not sure you need willful blindness in this case. I want to be clear, but I am troubled at the notion that, look, he had plenty of opportunities to find out what was in the package and he didn't. I don't think that's what we mean by willful blindness. We're looking for some affirmative act, like an intentional act to avoid finding out what is in the package, and I'm just wondering if there was anything like that here. Your Honor, there's nothing like that specific here? I thought you were going to say maybe the part where he walked out of his house after his alleged co-conspirator walks in so that he's maybe not in the house when the other guy is in there with the package. You don't think so? I do believe that that is a possibility, Your Honor, that Mr. Ath potentially exits the house once while Mr. Cheng was inside the residence gathering items that were later found inside the plastic bag when he was arrested. It is also equally relevant, Your Honor, to willful blindness in the government's... as is the government's position that Mr. Ath willfully neglected to inquire about the contents of the package or the delivery of the package with Inspector Nicholson and the contents of the package as to Mr. Cheng. Mr. Ath had ample opportunity to do so, and the government believes that his failure to do so can be considered an affirmative step in order to avoid knowing what was the contents of the package. Government believes that it's proved knowledge either both actually and under the doctrine of willful blindness. The district court found that the government had at least proven willful blindness as to each of the counts of conviction and so stated in its order. Your Honors, it's also important when talking about actual knowledge to examine how the offenses were committed. In this case, Mr. Ath's or the government's position regarding Mr. Ath's involvement, it did not begin on September 7, 2016. As opposing counsel stated, this conspiracy dates back to 2012 or the conduct dates back to 2012. There are two packages intercepted by the postal inspector, two marijuana packages intercepted by the postal inspector en route to 199 Black Street. One of the first package that was intercepted was intercepted in October 2012. The package bore a return address nearly identical to the package, the address used by the defendant's brother, Sothe Ath, the California address of Sothe Ath at the time. Belay Fabmase was the only cooperating defendant who served as a witness for the government at trial. Mr. Fabmase testified that he was familiar with the Ath family and knew them from the time they lived in California. According to Mr. Fabmase's testimony, Sothe Ath ran multiple marijuana grow operations in Fresno and Bakersfield, California. From 2010 to 2015, Mr. Fabmase worked from time to time for Mr. Ath in the marijuana grow Ath. According to Fabmase's testimony, Mr. Sothe Ath told him, and he observed, Sothe Ath and Bird Chang, who happens to be the appellant's son-in-law, shipped marijuana packages to Sothe Ath's family in South Carolina. That is confirmed by the interceptions made by the postal inspector in October 2012 and October 2014. In addition, Your Honor, the sustained level of illegal conduct over a period of many years is also probative as to the defendant's or the co-conspirator's, specifically Mr. Ath's, knowledge of the conspiracy or the criminal offenses with which he was involving himself. Ms. Washington, I want to get back to the willful blindness aspect of it. Yes, sir. I think, as I understand Judge Harris' questions and I understand, I think, what gives her pause, and, well, in terms of, first of all, why you rely so much on it, I wonder, but willful blindness is the idea that you're blind to what is openly done before you. The premise of willful blindness is to be blind to what you see, and what you see is criminal conduct, and you willfully, like, ignore it and turn away from it. The problem here is that the person in the video who received it, there's no evidence that he saw anything more than the defendant did, and that is a box with his address on it. So what did he see in terms of culpability from the other person that he turned away from? Your Honor, willful blindness is defined in case. What did he see in terms of the conduct of the other person that openly showed criminal conduct? Because that's the basis of it. What did he openly see from the other person's conduct that he ignored? Mr. Ath ignored the fact that Mr. Chang entered his residence to pick up the package. In fact, Mr. Ath – But what's the evidence that – how do we know it's in the package? Your Honor, the government – You can't double it. You're trying to say it was openly done. How do you know that the person knew what was in the package? Your Honor, the government has presented no direct evidence as to Mr. Ath's direct knowledge of what was contained inside the package. The government never argued that it did. Okay, so what criminal conduct existed that the defendant turned his back to that was open? He received – it was, at best, maybe a misdelivered package. My address – and I think all of us have – I've received a lot of things in the mail, but my address is not my name. Now, if I had that package in my house, and upon your police officers seeing this on the video that I accepted, the mailman looked at it, looked at it, and I took it in my home. If they went in, would there be willful blindness if it turned out there were drugs in that envelope? Your Honor, I believe the facts of this case are a little bit different. I know that. That's why I'm giving you a hypothetical. Would it be willful blindness if I kept that for 48 hours in my home? No, Your Honor. Why not? I saw it was my address, not my name on it. What did I turn my back to? It certainly wasn't illegal for you to come home and find a package that was misdelivered to your address. And keep it in my home for 48 hours? Keep it in your home until you are able to return it to the Postal Service as misdelivered mail. Well, I could have the next day. I could have written on here, Address C, not here, and put the red little flag up the next day, but I didn't. Yes, sir, and certainly that's a common practice. When you look at that, that's what the framers did. This is criminal conduct. It ought to be difficult to take away a person's liberty, and that's some of the protection. Again, I don't know why you base it so much on willful blindness, but in this case, I think you've got a lot more than that. But for that purpose, are you really sure that he's blind to what he's saying? Look, it's a package. My address, you know that, and somebody else picked it up. What does he turn his back to? Your Honor, the government's position is that Mr. Affler is certainly blind, deliberately blind, to the events that were going on around him, either whether or not it was the conduct of Mr. Chang or the conduct of his brother, Soph Aff. Mr. Chang entered Mr. Aff's residence four minutes after the package was delivered. It's certainly reasonable to infer that Mr. Aff and Mr. Chang orchestrated the delivery and the pickup of the package after it was taken from the postal inspector. Right, that they were in a conspiracy, but not that it was willful blindness. Mr. Aff took no steps to inquire or to learn about the contents of the package. The government believes that it's met its burden as to knowledge, actual knowledge by circumstantial evidence, which this court has ruled time and time again. Your Honor, I think it might be best focused on just what you said last in response to these questions, and probably is that he deliberately avoided discovering that meth was in it. Now the question is, maybe he already knew and didn't need to know, but the evidence was he did not try to discover what's in the package that's sent to his house, but sort of conveys it to the next person. There's no reason to give it to another person. There's no reason to give that. So he would have been more guilty if he had opened, in other words, he would have been exonerated if he had opened it up. He'd be possessed. That's what you just said. The answer to Judge Niemeyer's question, you said, yeah, he took no effort to try to find out what's in the meth. So if he had tore it open, then it's, oh, he's innocent because he tore it open and got the meth out. Does that make sense? No, Your Honor. I didn't understand Judge Niemeyer's question in that. He did say he took no effort to find out whether it was meth. The best way to find out is to open the box of it. Isn't the willful thing to avoid, to create deniability? Willful avoid. And he denied he knew what was in there. That's his defense. After the package was discovered, Your Honor, Mr. Aft did deny law enforcement, at least three different law enforcement agents, that he knew what was inside the package. He denied, Your Honor. The goal of blindness is not to learn what's in the package. In other words, he didn't want to know because then he'd be guilty of possession. But if he didn't know it was a controlled substance, then he can create deniability. He says, I was just conveying a package. I was just conveying a package. Yes, Your Honor. And in addition to the statements that Mr. Aft provided to the FBI agents, the false exculpatory statements, Mr. Aft admitted that he took the package on behalf of his son-in-law, Mr. Beard Chang. Mr. opposing counsel makes an argument that Mr. Aft's statement to law enforcement was not false or that it was not exculpatory. Mr. Aft took great pains to explain to law enforcement that while he accepted the package, he placed it on the porch for his son-in-law to pick up. According to the surveillance agents in the video itself, that was a false statement. Mr. Aft took those steps, and it's certainly reasonable for the jury to conclude that Mr. Aft told the agents he put it on the porch and never took it into his residence in an effort to distance himself from the package because he knew what it contained, especially combined with the previous deliveries or the previous packages that were shipped from his brother in California to his address at 199 Black Street. In addition, Your Honor, while Mr. Aft was being interviewed by FBI agents and during the time he was giving those statements, Postal Inspector Nicholson was interviewing Sothaft, Mr. Aft's brother. During the interviews, Inspector Nicholson specifically asked Sothaft whether or not his brother, Sean Aft, was involved in the delivery or distribution of drugs through the mail. Sothaft's response to the Postal Inspector was, I don't know. Given the evidence that the jury was able to observe and see in regards to Mr. Sothaft's involvement in the conspiracy, the leadership role that he played, it's certainly reasonable for a jury to conclude that had Mr. Sean Aft not had knowledge or accidentally involved himself in a drug conspiracy, that his brother, knowing what he knew or knowing that Mr. Sean Aft did not intend to involve himself in a drug conspiracy, would have said something different than, I don't know, and would have taken the opportunity to exonerate his brother had his brother not been knowingly involved in the conspiracy with which he was charged. Your Honor, I see that I am almost out of time. I think very briefly I'd like to address Mr. Lange's argument with regard to the Tenth Circuit cases. Of course those cases are not binding on this Court. The Tenth Circuit and the Second Circuit in Nusrati, and the Second Circuit and the Tenth Circuit in Raspberrian, specifically in Raspberrian, the Tenth Circuit just last year when asked to apply the holding on Raspberrian in a drug conspiracy case, the Tenth Circuit declined to do so and specifically stated that the only evidence involved in Raspberrian was the false exculpatory statement. Same situation as in Nusrati. This case is significantly different from each of those cases in that the evidence that the government presented and the evidence that was before the jury was much more than the false exculpatory statement. I regret that I did not include in my briefing the fact that the jury actually asked during deliberations to view the video a second time. It was played during the trial. During deliberations the jury asked to review the video, sent out a note. Court's exhibit number four is found at ECF 359. The jury had ample evidence before it with which to conclude the defendant's guilt beyond a reasonable doubt, and this Court should affirm the convictions before the district court. Thank you, counsel. Thank you. Mr. Lang, you have a few moments. Very briefly, Your Honor. We spent a good bit of time on the doctrine of willful blindness. Maybe I was wrong. I see why you vigorously defended it. The government relies on it apparently quite a bit. Go ahead. But I would like to go back, if I could, to a couple of other circumstantial evidence that was discussed briefly in my opening argument as well as with the government's argument. And the first is the intercepted deliveries. There were a total of eight intercepted deliveries. Not all of them. Only two of them were addressed to 199 Black Street. The rest were addressed to other addresses on Black Street, 203, 205, and I think 210. They all originated, though, in California. And there is no evidence in this record to indicate my client had any contact or any connection at all with California. Now, the conspirators. I'll accept that. Didn't Chang come from 210 on the day of the delivery in this case? I think there was testimony they came from the direction of 210 to get there. But I was speaking, rather, on the issue of the connection of where all these intercepted packages came from in California. And Chang is related, too, right? Well, he's related, Judge, but as I pointed out in my. But now you have two or three people related living in South Carolina on the same street a few houses apart. You have the relations, family relations in California, putting together the package and sending it. You have coordinated bank accounts. I mean, this is additional evidence on top of the other, which we discussed, which we didn't discuss earlier, which I think a jury could consider. I, again, respectfully disagree. You can't pick your relatives. And just because I have relatives who happen to be criminals and who happen. You can't isolate something like this. You put together all the facts and you say, where in the cosmos do all those facts come together? And here you have a family sending packages to each other. We know it's contraband. The only thing we don't know is who knows what. And that, I would suggest to the court, is the key who knows what. And my client did not know. And the evidence of knowledge, which you can only infer through circumstantial evidence, just in this case simply is not there. And the packages were never delivered. These packages that were sent from California from 2014 to 2016 were never delivered. And there's no evidence whatsoever to indicate that any other packages that were not intercepted were actually delivered to my client's address or any other Black Street address. And accordingly, that inference that the government would seek to have the jury draw is one that I suggest is not a rational inference. It's not a reasonable inference. The package addressed at 199 would have ended up at 199 had it not been intercepted. That's purely speculative, though, Your Honor, because we don't have that evidence in the record. That assumes the mail service doesn't function. I'm sorry? That assumes the mail service doesn't function. Well, I think the mail service functions quite well, as did the postal service, when it intercepted those eight packages that never got to my client. So there's no evidence. Well, I know they were addressed there. So the question is, we assume they would have ended up there, right? Well, that's the assumption, but they didn't. And we know that fact because they did not, that to infer then that my client somehow knew that these packages were coming to his house other than the one that actually got delivered is an inference that I would suggest to the court cannot be drawn as to knowledge. The false exculpatory statements, I talked about that a little bit in my opening argument. Again, I would suggest to the court that that statement has to be exculpatory in some fashion, not just simply incorrect as to a sequence of events. And in this particular circumstance, nothing that my client said was exculpatory. The fact of the matter is he took the package. That's all I have, Your Honor, which I'll be happy to ask, and I appreciate your inviting me to come. Mr. Lang, the court knows that you're a court opponent, and we want to give you a thank you for doing that. The court could not operate without lawyers like yourself who take on these cases, and we appreciate it and thank you very much. It's my pleasure, Your Honor. Also, we recognize you're able to represent the United States. With that, we'll ask the clerk to recess to court. Yeah, recess to court, I guess, or adjourn the court for the day. They will come down to Greek Council. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: Roger L. Gregory, Paul V. Niemeyer, Pamela A. Harris